[Crim. No. 6504. Second Dist., Div. Three. June 8, 1959.]

THE PEOPLE, Respondent, v. MIKE O'MALLEY BLANKENSHIP, Appellant.

Leslie & Bernson for Appellant.

Stanley Mosk, Attorney General, Norman H. Sokolow and David B. Allen, Deputy Attorneys General, for Respondent.

SHINN, P. J.—In a jury trial, Mike O'Malley Blankenship was convicted of violating Vehicle Code, section 480, and was granted probation on condition that he serve 90 days in the county jail. He appeals from the order denying his motion for new trial and has noticed an appeal from the verdict.

The sole contention on the appeal is the insufficiency of the evidence to establish appellant's guilt of a hit and run violation. As we shall see, this contention is destitute of merit.

John Kingston was riding his motorcycle north on Reseda Boulevard shortly after midnight on May 1, 1958. He came upon a late-model light-colored Cadillac convertible with a white top; a man and a woman were in the car; the man was driving; the driver had a crew hair cut and was wearing a military shirt with emblems on it; appellant was the driver. Upon being shown a photograph of a Cadillac registered to Mrs. Blankenship, Kingston testified that it resembled the convertible he saw on May 1st.

As Kingston started to pass the Cadillac, appellant told him to "get the God damn bike off the road and keep it away from his car." Kingston dropped behind the car and followed it for several blocks in the same lane of traffic at a distance of one or two car lengths. Suddenly, between intersections, the Cadillac's stop lights flashed and the vehicle skidded to a stop. Kingston applied his brakes and swerved to the right to avoid a collision, but his motorcycle struck the right rear end of the Cadillac, precipitating him to the ground and pinning him under the motorcycle. He sustained a compound fracture of the leg and other injuries. On cross-examination, Kingston admitted having been convicted of three violations of Penal Code, section 288, for which he was placed on probation.

The collision was witnessed by a Mr. Azar and his mother, who were driving north on Reseda in a pick-up truck in the same lane of traffic as the two vehicles, about 150 feet behind the motorcycle. They saw the car's rear stop lights flash briefly and the automobile skid to a halt; there was no obstacle ahead of the car; the sound of the collision was quite loud; the car moved forward slightly on impact; then it sped away from the scene. No one got out of the car to identify himself or to render assistance to Kingston. Neither witness could identify the make of the car or the driver; they saw only one person in the car and could not tell whether the driver was a man or a woman. It was brought out on the cross-examination of Mr. Azar that at the preliminary hearing he had stated that Kingston was traveling behind the right side of the car, whereas he testified at the trial that the motorcycle was moving in line with the center of the car prior to the accident.

Police officers investigating the collision obtained from Kingston a description of the Cadillac and its driver. About half an hour later, Officer Giacopuzzi observed a car answering the description going south on Reseda Boulevard three-quarters of a mile north of the scene; it made a right turn off Reseda a block north of the scene. Giacopuzzi halted the car

and examined it with his flashlight; there were some fresh marks on the rear end. Appellant was sitting in the front seat; his hair was cut short and he was wearing a military shirt with shoulder emblems. Mrs. Blankenship was also in the front seat; appellant's brother was behind the wheel. When the officer asked them to accompany him to the scene of the accident the Blankenships complied.

The Cadillac and the motorcycle were examined at the scene by Officer Hatter, who was one of the investigating officers in the case. The motorcycle had been severely damaged. The left crash bar was bent back against the motor; the seat was torn off; the left handle bar was bent; the front fender and left foot rest had also been damaged. On the right rear fender of the Cadillac, near the taillight assembly, were what appeared to be splotches of blood; there was a black mark over the top of the rear bumper which extended into the right taillight assembly; scratches and dents were visible along the assembly. Officer Hatter measured and photographed two sets of skid marks left by the vehicles involved in the collision; the car left 37½ feet of four-wheel locked straight skid marks; the motorcycle left 39 feet of marks which ran between the tire marks of the car for half of that distance, then swerved to the right. However, Hatter did not compare the width of the automobile skid marks with the width of the Cadillac's tires. There was opinion evidence given by an expert that the car had been traveling at 24 miles an hour prior to the accident and the motorcycle slightly faster.

The two vehicles were impounded and subjected to further examination the following day by Officer Carter, a qualified police chemist. Carter tested some reddish-brown stains located just above the right tail light of the Cadillac and found them to consist of human blood; there was insufficient blood to perform a blood type test; the stains could have been more than three or four days old. From the shape of the stains, Carter concluded that the blood was traveling upward when it hit the car. The witness removed a black substance which had left a mark near the car's right taillight and compared it with the left handle grip of the motorcycle; in his opinion, they were of the same general type of rubber-like material. Carter compared some cloth fibers removed from the right taillight assembly with fibers from Kingston's cap; the substances were similar and could have come from the same source. He also compared metal transfers on the left crash bar of the motorcycle with the metallic content of the Cadillac's exhaust port,

which had been damaged in the collision. In Carter's opinion, the substances were of the same composition. He found no metal transfers on the car.

Photographs showing the skid marks and the damage to the vehicles and slides containing some of the materials compared by Officer Carter were received in evidence as exhibits.

Appellant and Mrs. Blankenship related their activities on the morning of May 1st. They went to a barroom around 11 p. m. and left shortly after midnight, proceeding north on Reseda Boulevard. Mrs. Blankenship was driving. The top was up, the rear flap closed, the right window shut and the left window partially open. Some motorcyclists, among them Kingston, followed them along Reseda. When Mrs. Blankenship pulled over to the right and stopped, Kingston pulled in on the right side of the car. Appellant rolled down the window and asked Kingston if he was a policeman; Kingston said nothing. Appellant then exchanged seats with his wife and drove on. As they proceeded, Kingston drove up on the left hand side of the car and asked appellant if he had a badge; when appellant denied having a badge, Kingston said that he had one. Kingston rode his motorcycle next to the driver's side of the car for about a mile, cursing and trying to get appellant to pull over to the right, which he refused to do. After a while, they no longer saw any motorcyclists.

The Blankenships denied having been in a collision. They did not recall hearing any loud noise while going north on Reseda; they did not make any sudden stops and they did not stop in the middle of an intersection. They went to the home of appellant's brother and were on their way to take Mrs. Blankenship home when they were stopped by the police. After the Blankenships accompanied the officer to the scene of the accident, Mrs. Blankenship examined the rear end of the car but she did not notice anything unusual. Appellant admitted having said to Officer Hatter: "I don't care to look for any blood on the car. If there is any here, I don't know how it got there." But he denied telling the officer that he had said all he was going to say and that the officer could draw his own conclusions. Appellant's brother testified that he saw no skid marks at the scene of the accident and that he found none when he returned later in the morning to examine the highway.

A Dr. Murasky testified on behalf of appellant that Kingston told him at the receiving hospital that he had consumed five or six beers during the evening and had had no solid food

since noon. However, neither Mr. Azar nor Officer Hatter noticed an alcoholic odor on Kingston's breath.

There is no substance to appellant's contention that the evidence was insufficient to establish guilt.

█ The factual questions were whether appellant was driving the car which was struck by Kingston's motorcycle and whether, knowing that Kingston had been injured, he failed to stop, identify himself and render necessary aid. (Veh. Code, §§ 480, 482, subd. a.) There was circumstantial evidence from which the jury could logically conclude that Mrs. Blankenship's Cadillac sustained damage as a result of a collision with Kingston's vehicle and Kingston identified appellant as the driver of the car. Although Blankenship denied knowledge of any accident, knowledge could properly be inferred from the circumstances of the collision. (*People* v. *Moody,* 93 Cal.App.2d 66, 70 [208 P.2d 692] ; *People* v. *Kuhn,* 139 Cal.App.2d 109, 112 [292 P.2d 964].) The fact that Kingston was following closely behind the Cadillac, together with the further facts that the collision was forcible and was audible at a distance of 150 feet, amply warranted the jury in its determination that appellant knew Kingston had been injured and that his failure to stop was a deliberate one.

The appeal from the verdict is dismissed and the order denying appellant a new trial is affirmed.

Wood (Parker), J., and Vallée, J., concurred.